UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

PAMELA KATCH,

                Plaintiff,

                                        Case Number 07-14821-BC

v.                                   Honorable Thomas L. Ludington

FIFTH THIRD BANCORP,

                Defendant.

_____/

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DISMISSING AMENDED COMPLAINT WITH PREJUDICE

On November 8, 2007, Plaintiff Pamela Katch ("Plaintiff") filed a complaint against her former employer, Defendant Fifth Third Bancorp ("Defendant" or "Fifth Third"). Plaintiff's complaint alleged three counts, including (1) failure to accommodate under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, et seq., (2) retaliation under the ADA, and (3) failure to accommodate under the Michigan Persons with Disabilities Civil Rights Act (PWDCRA), Mich. Comp. Laws §§ 37.1101, et seq. Although Plaintiff entitled counts 1 and 3 "failure to accommodate," the counts also appear to allege "intentional discrimination" generally. On November 3, 2008, pursuant to the parties' stipulation, the Court dismissed with prejudice Plaintiff's retaliation count, and on November 4, 2008, Plaintiff filed an amended complaint with that count omitted.

Now before the Court is Defendant's motion for summary judgment [Dkt. # 16], filed on November 7, 2008. On December 5, 2008, Plaintiff filed a response [Dkt. # 22], and on December 16, 2008, Defendant filed a reply [Dkt. # 25]. The Court has reviewed the parties' submissions and finds that the facts and the law have been sufficiently set forth in the motion papers. The Court

concludes that oral argument will not aid in the disposition of the motion. Accordingly, it is **ORDERED** that the motion be decided on the papers submitted. *Compare* E.D. Mich. LR 7.1(e)(2).

In its motion for summary judgment, Defendant raises the following main arguments: (1) all of Plaintiff's ADA claims are time-barred or barred because Plaintiff failed to exhaust administrative remedies, (2) Plaintiff is not "disabled," within the meaning of the ADA or PWDCRA, (3) Plaintiff was not qualified for the relevant positions because she could not perform the essential functions of those positions, (4) Defendant did not have a duty to accommodate Plaintiff because she failed to request a reasonable accommodation, (5) Defendant fulfilled its obligations to provide Plaintiff with a reasonable accommodation, and (6) Defendant did not intentionally discriminate against Plaintiff.

For the reasons stated below, the Court will grant Defendant's motion for summary judgment on the grounds that all of Plaintiff's ADA claims are either time-barred, not properly before the Court because Plaintiff failed to exhaust administrative remedies, or Plaintiff cannot prove that she was disabled at the relevant point in time. The Court does not reach Defendant's other arguments. Additionally, the Court will decline to exercise jurisdiction over Plaintiff's state law claims, as no federal claims remain.

I

Plaintiff worked for Defendant as a senior office manager in its Owosso branch from June 2004 until she was seriously injured in an automobile accident in September 2005. In that accident, Plaintiff suffered facial injuries, a closed head injury, a substantial pelvic ring fracture, broken ribs, knee damage, and a liver contusion. Plaintiff remained hospitalized from September 20, 2005, through October 28, 2005. When she was discharged from the hospital, Plaintiff required a hospital

bed and other medical equipment and was limited in all physical activities.

In the months that followed, Plaintiff treated with Dr. Danielle C. Duncan, an orthopedist, as she worked to rehabilitate her injuries through therapy and medications. Plaintiff had various setbacks that required emergency hospital visits. By January 2006, she had progressed to walking short distances with a cane, while using a knee brace on her right leg, which she had to wear "around the clock." Because of her physical limitations, Plaintiff required nursing care through February 2006 and assistance for basic household chores and certain other daily activities through July 2006. As of March 2006, Plaintiff alleges that she still had substantial limitations in the use of her legs for walking, standing, sitting, climbing, and kneeling, and in the use of her arms for lifting, carrying, pushing, pulling, and reaching.

As a result of the automobile accident, Plaintiff required a leave of absence from her job with Defendant. When Plaintiff had exhausted her rights under the Family and Medical Leave Act ("FMLA"), she remained on a leave of absence pursuant to Defendant's "Supplemental Employee Medical Leave Policy." Defendant's policy provides that an employee on leave must provide a physician's release stating that the employee is fit to return to work or identifying work limitations or restrictions. If the employee's former position has been filled as of the date the employee is released to return to work, the employee must apply for an available position on Defendant's web-based system and has four weeks to locate another position. If the employee is unable to find another position or is offered a position and declines, the employee's employment will be terminated unless otherwise required by law.

When a position is listed as available on Defendant's web-based system, a recruiter is responsible for screening applicants, scheduling interviews, and making offers. Recruiters give

preference to internal candidates, i.e., an active employee currently working at a financial center. If an internal candidate applies for a position, the recruiter does not review the profiles of other candidates until a decision is made with regard to the internal candidate. If the internal candidate is hired, the recruiter does not review the profiles of the other candidates. Only if there are no internal candidates or the internal candidates are not hired does the recruiter review external applicant profiles and forward information regarding the best applicants to the hiring manager for interviews.

On March 21, 2006, Plaintiff's family doctor, Dr. Ruth Licht, released Plaintiff to work. Dr. Licht advised a graduated return with reduced hours initially, progressing to full-time, eight hours a day, five days a week, within six weeks. Eventually, Dr. Licht released Plaintiff to full-time work on May 8, 2006. Meanwhile, within the time allotted by Defendant's leave policy, Plaintiff interviewed for and secured a position as a customer service manager ("CSM") at Defendant's new State Street branch, scheduled to open on or about May 21, 2006, in Saginaw, Michigan. Janet Yankee, Sr., a human resources business partner, was the recruiter for the position and she testified that she knew of the severity of Plaintiff's automobile accident. In the interview, Yankee did not ask Plaintiff about her restrictions, only whether Plaintiff could perform the job.

Plaintiff began working as a CSM on April 24, 2006, before the new branch opened. According to Defendant, the only difference between Plaintiff's prior position as a senior office manager and the new position as a CSM was that direct sales were not part of the CSM position. As a CSM, Plaintiff's main focus was supervising the tellers. According to Plaintiff, the CSM position did not exceed the physical limitations imposed by Dr. Duncan because the position was almost entirely administrative.

-4-

For about the first month, Plaintiff spent her time shadowing a CSM in an established branch, and maintained a work schedule from 8:30 a.m. to 5:30 p.m. Huskins testified that Plaintiff discussed her automobile accident and her residual limitations with her on a number of occasions before the new branch opened. During the week before the branch opened, Plaintiff worked longer hours and spent a significant amount of time on her feet. Plaintiff testified that she began experiencing pain and swelling in her legs at that time. Plaintiff went to see Dr. Duncan, who imposed the following restrictions on May 30, 2006:

- Six to eight hours a day maximum as tolerated
- Must wear support socks
- Elevate legs
- Take thirty minute break in the middle of the day

According to Dr. Duncan's affidavit, she attributed Plaintiff's symptoms to Plaintiff's "reintroduction into the work place after her extended disability leave." Thus, she imposed "additional restrictions" that were "meant to be temporary."

Plaintiff relayed these restrictions to the financial center manager, Bryan Buksar, on May 31, 2006. Plaintiff testified that Buksar advised her that Defendant could accommodate the restrictions. Rose Huskins, regional manager, and Yankee were also advised of Plaintiff's restrictions. According to Plaintiff, and denied by Defendant, on a telephone call with Plaintiff, Huskins told Plaintiff, "this is a new branch, your ten-pound restriction was enough, but now you've gone too far," and hung up the phone. Huskins had recently learned of Plaintiff's ten-pound lifting restriction.

On June 1, 2006, Yankee told Plaintiff that she would like a copy of Dr. Duncan's restriction slip that incorporated the ten-pound lifting restriction and clarification about Dr. Duncan's direction

that Plaintiff elevate her legs. Yankee also testified that she questioned the meaning of "as tolerated," and asked Plaintiff to obtain further explanation of the restrictions. Similarly, Huskins testified that she had questions about what "as tolerated" meant, believing that it meant that Plaintiff could leave after three hours, for example, if she was having difficulty.

The same day, Plaintiff contacted Dr. Duncan for clarification, and Dr. Duncan issued an addendum which stated that Plaintiff "needs to elevate her legs thirty minutes every three to four hours." Dr. Duncan's office faxed this clarification to Yankee at about four o'clock in the afternoon on the same day. According to Plaintiff, at some point before three o'clock in the afternoon, Yankee told Plaintiff to reapply for a leave of absence.

The next day, June 2, 2006, Plaintiff met with Huskins, Yankee, and Buksar to discuss the restrictions. Plaintiff testified that Yankee stated that Defendant was placing her on leave and asked Plaintiff when she thought she would be one-hundred percent again. Plaintiff responded that she did not know. Defendant claims that Plaintiff voluntarily left her position after expressing during the meeting that she had returned to work too soon and that she was not ready. Plaintiff testified that she was told to clean out her office by June 3, and that her leave would be effective beginning June 5, 2006.

Plaintiff alleges that at this time, she was substantially restricted in the activities of walking, sitting, standing, lifting, reaching, pushing, pulling, sleeping, kneeling, crawling, and climbing. Plaintiff was taking medications for leg spasms and pain. Plaintiff also alleges that when Defendant forced her to take a leave of absence, that conduct sent her into an emotional tailspin from which she has yet to recover. Immediately after the June 2, 2006, meeting, Plaintiff began to suffer from gastric symptoms, including severe diarrhea and bleeding. Within two weeks of the meeting,

-6-

Plaintiff sought the help of Dr. Licht. Dr. Licht testified that she determined that Plaintiff's physical symptoms were caused by her emotional distress.

Dr. Licht further testified that she believed that the automobile accident caused Plaintiff to suffer from post traumatic stress disorder ("PTSD"). Dr. Licht noted that the accident had exacerbated Plaintiff's prior symptoms of depression and anxiety. According to Dr. Licht, Plaintiff's PTSD did not prevent Plaintiff from returning to work in April 2006, and Defendant's apparent rejection of her in June 2006 caused the exacerbation of Plaintiff's symptoms, particularly because that rejection was directly related to the physical residuals of Plaintiff's accident. Dr. Licht referred Plaintiff to a therapist and Plaintiff remains in therapy currently.

Sometime between the meeting and June 16, 2006, Plaintiff sent Yankee a letter stating: "Due to pending litigation with regard to my auto accident, my attorney is requesting written documentation stating the specific reasons(s) for removing me from my position as Service Manager . . . " On July 14, 2006, Yankee sent an email to Tania Ackerman, a leave of absence supervisor, stating that Plaintiff "had increasing pain which caused her to have increased restrictions that we were not able to accommodate in a brand new banking center of which she agreed." In response to the deposition question, "Do you contend that you could have accommodated [Plaintiff's] medical restrictions in June of 2006?", Huskins replied, "Yes."

Dr. Duncan modified Plaintiff's restrictions on July 27, 2006, to provide for an eight-hour maximum work day. On July 28, 2006, Yankee contacted Plaintiff and offered her a temporary position as a CSM at the Midland branch to fill in while the Midland CSM was on maternity leave. Yankee testified that at the time that she offered Plaintiff the Midland CSM job, she expected another position in Midland to become available due to a military leave, which could provide

-7-

another opportunity for Plaintiff.  Plaintiff discussed the temporary CSM position with Dr. Licht, who advised that she considered Plaintiff disabled at that point, due to depression.  Plaintiff did not accept the position, and provided Defendant with a note from Dr. Licht, dated July 31, 2006, which provided:

> [Plaintiff] is unable to resume work until re-evaluation in 3 weeks.  Dx: Severe depression and anxiety due to post traumatic stress disorder from MVA.  RTW pending re-evaluation 8/14/06.

Plaintiff testified that she would have been physically able to work at that point.  Thereafter, Plaintiff continued on an unpaid leave of absence until February 2007.

On February 12, 2007, Dr. Licht released Plaintiff to work on a graduated schedule:

> [Plaintiff] may RTW 2/12/07 2 days per week for 5 hrs per day maximum for the first 3 weeks, then 3 days per week for 5 hours per day for 2 weeks then she will need to be re-evaluated & determine progress.

According to Plaintiff, she contacted "HR Direct" and attempted to reach Huskins regarding her release and provided her doctor's slip to HR Direct and Huskins.  On February 20, 2007, when Plaintiff had not heard back from HR Direct or Huskins, Plaintiff tried to reach Yankee, but actually spoke with Jennifer Pieterzak in human resources.  Plaintiff testified that Pieterzak acknowledged that both Huskins and Yankee knew of Plaintiff's attempt to return to work; Plaintiff sent her work slip to Pieterzak and Yankee at that point.  Plaintiff documented her communications with employees of Defendant.  According to Plaintiff, Pieterzak informed her that she had been replaced at the State Street branch, that no jobs were available in the Saginaw or Bay area, but that Plaintiff could go on the web-based system and apply for jobs.  Plaintiff did not indicate to Pieterzak the type of job for which she was looking.

In March 2007, Plaintiff began bidding on jobs with Defendant as required by Defendant's

leave policy.  Plaintiff was not considered an internal candidate at the time of her applications.  First, on March 19, 2007, Plaintiff applied for a CSM position at the Bay City branch.  According to Defendant, the position was filled by an internal candidate and Yankee, the recruiter, did not know that Plaintiff had applied for the position.

Also in March 2007, Dr. Licht stated in support of Plaintiff's claim for social security disability benefits:

> Her functional limitations at the time are more mental than physical despite the multiple fractures she had in the accident.  With the cognitive deficits from her head injuries sustained in the motor vehicle accident, she will never be able to return to her previous job due to the deficits in executive functioning and memory.

On April 23, 2007, Plaintiff applied for a full-time customer service representative, a.k.a. teller, position at the Durand branch.  According to Defendant, the recruiter, Michelle Lewis, did not interview Plaintiff for this position because she did not have the required return-to-work information.  According to Plaintiff, on April 25, 2007, she received a call from Lewis, informing her that the position had been filled.  Lewis asked Plaintiff why she was interested in non-management teller positions and advised her that she would have to talk with Plaintiff's former managers and pull her file regarding her interest in returning to work for Defendant.

Then, according to Plaintiff, Lewis left Plaintiff a message on April 30, 2007, advising Plaintiff that she had no return-to-work information for Plaintiff.  On May 18, 2007, Plaintiff advised Lewis that she had been released by her physician to work and had given Dr. Licht's release to HR Direct and that HR Direct had previously acknowledged the release in February 2007.  Plaintiff sent Defendant another copy of the release to return to work in May 2007.

Meanwhile, Dr. Licht released Plaintiff to full-time work on May 1, 2007.  Apparently, Plaintiff does not claim that a note from Dr. Licht was provided to Defendant at this time, although

Plaintiff had obtained a note when she was applying for a non-managerial position with another bank. Dr. Licht testified that she had concluded that Plaintiff was restricted from performing a managerial job as of April 30, 2007. Later, on May 8, 2007, Dr. Licht issued a return-to-work slip, stating that "[Plaintiff] may return to a 8 hour work day/40 hour work week with restrictions of no managerial job, due to pt's anxiety and depression."

On May 25, 2007, Plaintiff applied for a part-time teller position at the Owosso branch, which she had worked at prior to the September 2005 automobile accident. Lewis, as the recruiter, scheduled Plaintiff for an interview with the financial center manager of the branch, Michelle Schwab. Prior to the interview, Schwab informed Lewis that she had reservations about Plaintiff's application because some staff reported that they had experienced negative interactions with Plaintiff in the past. Lewis testified that Schwab informed her that tellers who had previously worked under Plaintiff responded negatively upon learning that Plaintiff applied for the position and threatened to quit if Plaintiff was hired. Schwab testified that her decision not to hire Plaintiff was affected by the comments of her staff and Plaintiff's interview.

According to Plaintiff, she had been highly successful while working at the Owosso branch previously. She had achieved the branch's sales goals and improved its audit score. She testified that she worked well with staff there and handled both staff and customer relations effectively. Schwab and Guy Salander interviewed Plaintiff on July 1, 2007. According to Defendant, as part of the interview, Plaintiff was required to go through the same employment testing as other candidates interviewed for the position and was asked the same set of structured questions, including a question about sales. Plaintiff's response to the question regarding sales was evaluated negatively by the interviewers, as reflected in their interview notes. Schwab testified that Plaintiff had said that

-10-

she was not successful at sales and had let the desk people handle sales in her prior position. Plaintiff denies that sales was discussed during the interview. Plaintiff claims that Schwab required Plaintiff to take a basic math test and "showed her how to work a calculator." Schwab testified that she had no knowledge of Plaintiff's physical limitations, if any. Another external candidate was awarded the position on August 16, 2007.

On June 19, 2007, Plaintiff applied for a part-time teller position at the Durand branch. Lewis, the recruiter, did not schedule Plaintiff for an interview and another candidate was offered and accepted the position on June 28, 2007. According to Defendant, Lewis knew that Plaintiff had been on a leave of absence related to a medical condition and was attempting to return to work. Also on June 19, 2007, Plaintiff applied for a full-time teller position at the State Street branch in Saginaw. An internal candidate was hired on about July 11, 2007, thus, Plaintiff's application was never reviewed by Yankee, the recruiter.

Again on June 19, 2007, Plaintiff applied for a position as a full-time teller at the Tittabawassee Road branch in Saginaw. According to Defendant, interview selections were made before Plaintiff applied for the position and all interviews took place on June 21, 2007. After selecting interviewees, the recruiter, Yankee, did not review the candidates again, thus, she did not know that Plaintiff had applied. A candidate was hired on July 9, 2007.

On August 8, 2007, Plaintiff applied for a part-time teller position at the Owosso branch. According to Defendant, Plaintiff had already been disqualified from a teller position by Schwab, who had conveyed that information to Lewis.

Ultimately, in October 2007, Defendant terminated Plaintiff's employment.

Meanwhile, on March 30, 2007, Plaintiff faxed a three-page, handwritten statement to the

EEOC.  Plaintiff wrote, in part, "I would like to file a complaint against Fifth Third Bank, 5430 State St, Saginaw, MI . . . My complaint is failure to work with a disability."  Plaintiff then outlined the circumstances which led to her leave of absence commencing on June 5, 2006.  Plaintiff further indicated that she had been released to work on February 12, 2007, that she had spoken to Pieterzak on February 20, 2007, and that she had applied for a job as a CSM at the Bay City branch in March 2007.

On May 21, 2007, Plaintiff filed a formal charge of discrimination.  On the EEOC's charge form, Plaintiff checked the box for discrimination based on "disability."  She briefly described the incidents leading up to the meeting of June 2, 2006, indicated that her doctor released her for work on February 12, 2007, that she spoke to a human resources representative on February 20, 2007, and that she had applied for an available customer service manager position.

Later in May 2007, Plaintiff sent another letter to the EEOC, indicating that she would "like to add some information to [her] initial claim."  In that letter, which referenced the May 21, 2007, charge number, Plaintiff indicated that Defendant had failed to accommodate her on June 2, 2006, failed to re-instate her on February 12, 2007, and failed to reinstate or rehire her on April 23, 2007.

On December 5, 2007, Plaintiff filed a second formal charge of discrimination with the EEOC.  At the time that Plaintiff filed this charge, she was apparently represented by her current attorney, as her original complaint filed in this Court was filed by her current attorney one month prior to the filing of the EEOC charge.  On the charge form, Plaintiff checked the box for discrimination based on "retaliation."  She also checked the box for "continuing action."  In relevant part, Plaintiff stated:

> I believe that [Defendant] will not rehire or reinstate me do to the filing of my previous charge . . . I have applied for 6 teller positions with the bank since April 23, 2007.  I was set-

-12-

up for only one interview in Owosso, MI on July 2, 2007 with the banking center manager at the Corunna, MI location . . . .

I believe that I am being retaliated against for filing a previous charge against the company . . . .

## II

Under Rule 56(c), a court must review "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," to conclude that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). A fact is "material" if its resolution affects the outcome of the case. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics and Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Mich. Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 534 (6th Cir. 2002).

The party bringing the summary judgment motion has the initial burden of informing the court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). The party opposing the motion then may not

-13-

"rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact," but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The party who bears the burden of proof must present a jury question as to each element of the claim, *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000), rather than raise only "metaphysical doubt as to the material facts." *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991).

### III

As a threshold issue, Defendant contends that all of Plaintiff's ADA claims are either time-barred or barred because Plaintiff failed to exhaust available administrative remedies. In the alternative, Defendant contends that, inter alia, Plaintiff was not "disabled." As previously mentioned, these arguments dispose of all of Plaintiff's ADA claims and the Court does not reach Defendant's other arguments.

Each act that Defendant took, which Plaintiff alleges was discriminatory, constitutes a "discrete act" that must be analyzed separately. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002) (noting that "discrete acts" include acts "such as termination, failure to promote, denial of transfer, or refusal to hire"). Thus, the Court will examine the timeliness of Plaintiff's

-14-

ADA claims with respect to each act separately. *Id.* at 113 (stating that "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act").

### A

Defendant contends that Plaintiff's ADA claims based on Defendant's alleged conduct of forcing Plaintiff to take a leave of absence beginning in June 2006 are time-barred because Plaintiff did not "file a charge of discrimination with the EEOC within 300 days of the alleged discrimination." *Parry v. Mohawk Motors of Mich., Inc.*, 236 F.3d 299, 309 (6th Cir. 2000) (citing 42 U.S.C. § 12117(a), 42 U.S.C. § 2000e-5(e)(1), and *Jones v. Sumser Ret. Vill.*, 209 F.3d 851, 853 (6th Cir. 2000)). The three-hundred day limitations period runs from "the date on which the alleged discriminatory act . . . was communicated to the plaintiff." *Amini v. Oberlin Coll.*, 259 F.3d 493, 498 (6th Cir. 2001).

Plaintiff alleges that Defendant violated the ADA when it failed to accommodate her restrictions and "forced" her to take a leave of absence on June 2, 2006. Plaintiff filed a formal charge with the EEOC on May 21, 2007, more than three-hundred days later. However, Plaintiff contends that her ADA claims are not time-barred because she provided sufficient information regarding Defendant's alleged failure to accommodate her through her hand-written letter faxed to the EEOC on March 30, 2007, even though it was not a formal charge. Plaintiff relies on the U. S. Supreme Court's determination that "a filing is deemed a charge if the document reasonably can be construed to request agency action and appropriate relief on the employee's behalf." *Fed. Express Corp. v. Holowecki*, - - - U.S. - - - -, 128 S. Ct. 1147, 1159 (2008).

Even assuming that the hand-written letter was sufficient to constitute a charge, Defendant contends that the three-hundred day limitations period ended on March 29, 2007, the day before

-15-

Plaintiff faxed her letter to the EEOC.  Based on the undisputed fact that Plaintiff learned of Defendant's decision to place her on a leave of absence on June 2, 2006, Defendant's contention is correct.  Thus, it appears that Plaintiff's ADA claims based on the "forced" leave of absence are time-barred.

Nevertheless, Plaintiff asserts that the filing period for an EEOC charge can be equitably tolled when there is, inter alia, "[m]isleading information or mishandling of the charge by the EEOC."  EEOC Compliance Manual § 2(IV)(D)(1).  Plaintiff contends that she relied on an email from Don Best at the EEOC, which stated:

> Based on you finding out about the decision to force you on leave on Saturday, June 3, 2006 with the leave commencing on Monday, June 5, 2006.  The last day you were eligible to file before your time limits ended would have been Friday, March 30, 2007.  To file a charge you must have signed a sworn document with the field office.

Best sent the email to Plaintiff on April 6, 2007, in response to her email, dated April 3, 2007, in which she indicated that she had filed a claim on March 30, 2007.  Plaintiff could not have relied on Best's email to determine when to file her charge because Best had not yet sent the email. Plaintiff does not allege that anyone at the EEOC told her, before March 30, 2007, that she had until that date to file a charge.  Thus, Plaintiff has not advanced any evidence to show that the EEOC gave her misinformation or mishandled her claim.

Furthermore, Best's email actually supports a determination that the limitations period ran on March 29, 2007, because Best assumed that Plaintiff found out about Defendant's decision to place her on leave on June 3, 2006, when, in fact, it is undisputed that Plaintiff found out on June 2, 2006, one day earlier.  Thus, the limitations period would end on March 29, 2007, one day earlier than indicated in Best's email.

Based on the above, "misleading information or mishandling of the charge by the EEOC"

-16-

does not toll the limitations period on Plaintiff's claim.  Although the U. S. Supreme Court has recognized "that filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in Federal Court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling," *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982), Plaintiff does not assert any other grounds for equitable tolling.  *See Amini*, 259 F.3d at 500 (stating that "[t]he decision whether to equitably toll a period of limitations must be decided on a case by case basis," and may include consideration of "1) lack of notice of the filing requirement; 2) lack of constructive knowledge of the filing requirement; 3) diligence in pursuing one's rights; 4) absence of prejudice to the defendant; and 5) the plaintiff's reasonableness in remaining ignorant of the particular legal requirement for filing his [or her] claim") (internal citations omitted); *Steiner v. Henderson*, 354 F.3d 432, 435 (6th Cir. 2003).  "[T]ypically, equitable tolling applies only when a litigant's failure to meet a legally-mandated deadline arose from circumstances beyond that litigant's control."  *Steiner*, 354 F.3d at 438 (internal quotations omitted); *Rose v. Dole*, 945 F.2d 1331, 1335 (6th Cir. 1991) (per curiam) (stating that "[i]t is well-settled that ignorance of the law alone is not sufficient to warrant equitable tolling").  Thus, Plaintiff's ADA claims based on the June 2006 "forced" leave are time-barred.

While this result may seem harsh, "[p]rocedural requirements established by Congress for gaining access to the federal courts are not to be disregarded by courts out of a vague sympathy for particular litigants."  *Baldwin County Welcome Ctr. v. Brown*, 466 U.S. 147, 152 (1984); *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990) (noting that "[f]ederal courts have typically extended equitable relief only sparingly").  "Even where a plaintiff misses the filing deadline by only one day, we will not excuse this failure if other circumstances do not justify equitable tolling."

*McKibben v. Hamilton County*, 215 F.3d 1327 (table), 2000 WL 761879, at *3 (6th Cir. May 30, 2000) (citing *Goodman v. City Prods. Corp., Ben Franklin Div.*, 425 F.2d 702, 703-04 (6th Cir. 1970)). Additionally, the fact that Plaintiff's charge may have been timely with respect to other discrete acts alleged therein, does not make Plaintiff's claims arising out of the "forced" leave of June 2006 timely. *Morgan*, 536 U.S. at 112 (stating that "discrete acts that fall within the statutory time period do not make timely acts that fall outside the time period"). Accordingly, the Court will grant Defendant's motion for summary judgment at to Plaintiff's ADA claims based on the "forced" leave of June 2006.

B

Plaintiff's formal charge filed with the EEOC on May 21, 2007, refers to the fact that on February 12, 2007, Plaintiff's doctor released her to work, albeit on a part-time basis. The letter that Plaintiff sent to the EEOC in May, subsequent to her formal charge, also indicates that Plaintiff charged Defendant with failing to reinstate her on February 12, 2007. However, at that point, Plaintiff had exhausted her FMLA leave and, according to Defendant's leave policy, was required to reapply for available positions on Defendant's web-based system. Accordingly, although a claim would be timely, Plaintiff does not have a claim that arose on February 12, 2007, as Plaintiff had not yet applied for any available positions. Accordingly, to the extent that Plaintiff alleges an ADA claim arising on February 12, 2007, the Court will grant Defendant's motion for summary judgment.

C

On March 19, 2007, Plaintiff applied for a CSM position at the Bay City branch. Plaintiff's March 30, 2007, letter to the EEOC references the fact that she applied for a CSM position at the Bay City branch. Additionally, Plaintiff's formal charge filed with the EEOC on May 21, 2007,

-18-

mentions that she applied for a CSM position.  Although the formal charge does not specify the date that Plaintiff applied for the position, or at which branch the position was available, the Bay City branch opening was the only CSM position for which Plaintiff had applied.

According to Defendant, and undisputed by Plaintiff, the position was filled by an internal candidate and Yankee, the recruiter, did not know that Plaintiff had applied for the position when she filled the position.  Because Defendant was not even aware that Plaintiff had applied for the position, Defendant cannot have discriminated against Plaintiff by failing to reinstate her or failing to accommodate her.  Accordingly, the Court will grant Defendant's motion for summary judgment to the extent that Plaintiff alleges ADA claims arising out of her March 19, 2007, application for a CSM position at the Bay City branch.

## D

On April 23, 2007, Plaintiff applied for a full-time teller position at the Durand branch.  Plaintiff did not refer to this application in the formal charge that she filed with the EEOC on May 21, 2007.  However, Plaintiff referred to it in her subsequent letter to the EEOC that same month.  Plaintiff also referred to this application in her charge filed with the EEOC on December 5, 2007.

Defendant argues that Plaintiff failed to exhaust administrative remedies with respect to this claim for two reasons.  First, Defendant contends that it did not have notice that Plaintiff was claiming disability discrimination or failure to accommodate based on this application because Plaintiff did not refer to it in her formal charge to the EEOC in May 2007, and Defendant did not receive a copy of Plaintiff's subsequent letter to the EEOC, which did refer to the application.  Second, Defendant contends that Plaintiff's formal charge filed in December 2007, which refers to the application, only charges "retaliation," because Plaintiff did not check the box for discrimination

-19-

based on "disability."

Defendant is correct that federal courts do not have subject matter jurisdiction of ADA claims "unless the claimant explicitly files the claim in an EEOC charge or the claim can reasonably be expected to grow out of the EEOC charge." *Jones*, 209 F.3d at 853 (quoting *Abeita*, 159 F.3d at 254). While complainants' charges may be liberally construed, plaintiffs are not "excused from filing charges on a particular discrimination claim before suing in federal court." *Id.* (quoting *Davis v. Sodexho*, 157 F.3d 460, 463 (6th Cir. 1998)). Thus, "[t]he claim must grow out of the investigation or the facts alleged in the charge must be sufficiently related to the claim such that those facts would prompt investigation of the claim." *Id.* (internal citation omitted). *See, e.g.*, *Davis*, 157 F.3d at 463 (stating that "where facts related with respect to the charged claim would prompt the EEOC to investigate a different, uncharged claim, the plaintiff is not precluded from bringing suit on that claim").

Significantly, Plaintiff did not state any facts related to her April 23, 2007, application in her May 2007 formal charge. Also, given that each time that Defendant rejected an application submitted by Plaintiff is a "discrete act," the facts alleged in Plaintiff's May 2007 formal charge would not be likely to "prompt investigation of the claim." However, Plaintiff's subsequent May letter to the EEOC does refer to her April application. The letter includes the May 2007 formal charge number and should therefore be considered part of the formal charge.

While Defendant claims that it did not receive a copy of Plaintiff's May letter to the EEOC, Plaintiff's letter would have prompted investigation of the claim. Although notice to the employer is one of the purposes of requiring a plaintiff to file a charge, specific notice is not an absolute requirement, because, for example, a plaintiff is not required to file a second EEOC charge when

a retaliation claim grows out of an investigation into an initial charge of discrimination.

However, Plaintiff cannot prove that she was "disabled" within the meaning of the ADA at the time that Defendant rejected her application. The ADA prohibits discrimination against a qualified individual with a disability because of the disability. 42 U.S.C. § 12112(a). Thus, to succeed on either a discrimination or failure to accommodate claim under the ADA, Plaintiff must show that she was "disabled" within the meaning of the ADA. *See, e.g.*, *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 417 (6th Cir. 2004); *Smith v. Ameritech*, 129 F.3d 857, 866 (6th Cir. 1997).

The ADA defines "disability" as a physical or mental impairment that substantially limits one or more of the major life activities of the individual." 42 U.S.C. § 12102(2). "Merely having an impairment does not make one disabled for purposes of the ADA." *Toyota Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 195 (2002). A claimant must also establish that her impairment "substantially" limits one or more "major life activities." *Id.* at 196. According to the EEOC regulations, promulgated pursuant to the ADA,

> 'substantially limited' means 'unable to perform a major life activity that the average person in the general population can perform'; or 'significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.'

*Id.* at 195-96 (quoting 29 C.F.R. § 1630.2(j)).

In *Toyota*, the Supreme Court held that the requirement that an impairment "substantially" limit a major life activity "precludes impairments that interfere in only a minor way . . . from qualifying as disabilities." *Id.* at 196. The Court also held that the phrase "major life activities" refers "to those activities that are of central importance to daily life." *Id.* "Whether a claimant

-21-

qualifies as having a disability requires an individualized inquiry." *Bryson v. Regis Corp.*, 498 F.3d 561, 575 (6th Cir. 2007)(citing *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483 (1999)). "One of the factors that is relevant to determining whether an impairment amounts to a disability is whether it is 'permanent or long-term.' " *Bryson*, 498 F.3d at 575 (quoting *Toyota*, 534 U.S. at 198). Generally, an "impairment that only moderately or intermittently prevents an individual from performing major life activities is not a substantial limitation" under the ADA. *Mahon v. Crowell*, 295 F.3d 585, 590-91 (6th Cir. 2002).

Plaintiff contends that she is "substantially limited" in the "major life activities" of walking, sitting, standing, and lifting.[1]  In an affidavit attached to her response to Defendant's motion for summary judgment, Plaintiff describes her physical and mental impairments during the relevant time period as follows:

> In March of 2007, I underwent a Functional Capacity Evaluation.  This confirmed my limitation to sedentary work, I was not able to walk more than 1 hour at a time and that I must alternate sit and stand after 30 minutes to 1 hour; I was not to kneel, crawl, or climb and I was limited in lifting to no more than 20# and 10# occasionally.  I was still limited in reaching and pushing and pulling as before.  The form completed by my doctor's office shows that I cannot walk or stand without interruption for more than an hour and I am not to sit or stand more than 30 minutes or less, as tolerated.  I am never to climb, kneel or crawl and I am to totally avoid ladders.  These restrictions have continued since March of 2007.

Plaintiff also stated that her "permanent restrictions include not lifting, pushing or pulling over 10# on more than an occasional basis, no kneeling or crawling . . . ; no stair climbing, limited bending, twisting or stooping intermittently and only occasionally throughout the day because it would be too painful to perform these things more than infrequently due to my injury."  Plaintiff also states that

---

[1]  In her response to Defendant's motion for summary judgment, Plaintiff also alleges that she is limited in the "major life activities" of sleeping, reaching, pushing, and pulling.  However, Plaintiff did not allege limitations in these activities in response to Defendant's interrogatories, nor in any other pleadings. Plaintiff also appears to make an argument that several, less than "substantial" limitations in multiple major life activities can amount to a disability.  However, she states no legal authority for this proposition.

she does not "sit, stand or walk without pain in my leg and groin," and that she has "muscle spasms in both legs."

According to Dr. Duncan's affidavit, as a result of the functional capacity evaluation ordered by her and completed by Plaintiff on March 7, 2007, Plaintiff's limitations were as follows:

> It was my opinion at the time that [Plaintiff] was to avoid climbing, kneeling, and crawling and that she must continue with restrictions against uninterrupted standing, walking or sitting. Further, it was my opinion at the time, based primarily on the FCE, that she was not to stand more than 30 minutes to 1 hour at one time for a maximum of 3 to 4 hours total throughout an 8 hour work day, sit more than 30 minutes without interruption up to a total of 5 hours in a given work day, alternate sit/stand, and limit her lifting and carrying to no more than 25 pounds "very little" of the time (here it would be 1-2 times per hour or so in an 8 hour work day).

Despite Plaintiff's and Dr. Duncan's affidavits, none of Plaintiff's work restriction or return-to-work slips issued by either of Plaintiff's doctors reference physical limitations subsequent to Plaintiff's leave of absence beginning in June 2006. Neither of Plaintiff's doctors ever indicated that any of Plaintiff's limitations were permanent. The last work restriction or return to work slip provided by either of Plaintiff's doctors that referenced specific physical limitations was nearly a year prior, on May 30, 2006, when Dr. Duncan indicated Plaintiff must work only six to eight hours a day, as tolerated, wear support socks, elevate her legs for thirty minutes every three to four hours, and take a thirty minute break in the middle of day. At that time, Dr. Duncan stated that the restrictions were "temporary." Indeed, on July 27, 2006, Dr. Duncan modified Plaintiff's restrictions to provide for an eight-hour maximum work day.

Subsequently, on July 31, 2006, Dr. Licht provided a note stating that Plaintiff was unable to return to work due to depression, anxiety, and PTSD. The note made no mention of physical restrictions and Plaintiff testified that she would have physically been able to work at that point. Over six months later, on February 12, 2007, Dr. Licht returned Plaintiff to work on a graduated

-23-

schedule, providing for two days per week for five hours each day for three weeks, then three days per week for five hours each day for two weeks, and then a reevaluation. That return-to work slip did not reference any physical restrictions.

In March 2007, in support of Plaintiff's claim for social security benefits, Dr. Licht stated that Plaintiff's limitations are "more mental than physical." On May 8, 2007, Dr. Licht issued Plaintiff a return-to-work slip, which allowed for an eight-hour per day, forty-hour work week. The only restriction was that Plaintiff could not have a managerial job due to her anxiety and depression. No physical restrictions or limitations were referenced.

Specifically with respect to walking, the functional capacity evaluation shows that Plaintiff could walk one to thirty-three percent of the day. During the evaluation and in her affidavit, Plaintiff indicated that she could walk for an hour without stopping, and she successfully completed the thirty-minute walking test that was part of the evaluation. Dr. Duncan's subsequent medical evaluation concluded that Plaintiff could walk for an hour without interruption.

Specifically with respect to standing, the functional capacity evaluation shows that Plaintiff could stand one to thirty-three percent of the day. During the functional capacity evaluation, Plaintiff apparently stood for less than forty-five minutes. Dr. Duncan's subsequent medical evaluation concluded that Plaintiff could stand for one hour without interruption. Dr. Duncan's affidavit stated that Plaintiff should not "stand more than 30 minutes to 1 hour at one time for a maximum of 3 to 4 hours total throughout an 8 hour work day."

Specifically with respect to sitting, the functional capacity evaluation shows that Plaintiff could sit thirty-four to sixty-six percent of the day. Although it appears that Plaintiff did not successfully sit for thirty minutes during the functional capacity evaluation, she indicated that she

-24-

could not sit for more than three hours.  Dr. Duncan's subsequent medical evaluation concluded that Plaintiff could sit up to five hours a day, but only for thirty-minutes uninterrupted, as she would need to sit or stand as tolerated.

With respect to the major life activity of lifting, Plaintiff testified that she has a permanent ten-pound restriction.  Yet, in March 2007, subsequent to the functional capacity evaluation, Dr. Duncan stated that Plaintiff could lift up to twenty-five pounds occasionally, up to twelve pounds frequently, and up to five pounds constantly.  Indeed, Dr. Duncan's affidavit states that Plaintiff should not lift twenty-five pounds more than one to two times per hour in an eight-hour day.  This is not a "substantial limitation."  *See Linser v. Ohio Dep't of Mental Health*, 234 F.3d 1268 (table), 2000 WL 1529809, at *3 (6th Cir. Oct. 6, 2000) (finding that the plaintiff was not substantially limited in the major life activity of lifting when she provided a doctor's report indicating that she could not lift more than ten pounds, but the report suggested that the problem may not be permanent because the doctor intended to reevaluate the plaintiff in six months).

Generally, the evaluator who performed the functional capacity evaluation stated that Plaintiff "has poor endurance to any functional activities and a work hardening/work conditioning program would be of great help."  This suggests that Plaintiff's physical limitations were expected to improve.  Indeed, as Plaintiff testified, in the period from September 2007 to March 2008, Plaintiff worked five to six hour days as a pharmacy technician and she was required to stand all but ten minutes of the day.

Viewing the facts in the light most favorable to Plaintiff, Plaintiff was not "substantially limited" in any "major life activity" as compared to "the average person in the general population." 29 C.F.R § 1630.2(j)(1).  Accordingly, the Court will grant Defendant's motion for summary

judgment as to Plaintiff's ADA claims arising out of her April 23, 2007, application.

E

On May 25, 2007, Plaintiff applied for a part-time teller position at the Owosso branch.  In her December 2007 EEOC charge, Plaintiff refers to this application when she refers to the fact that she has applied for six teller positions with Defendant since April 23, 2007.  Consistent with its arguments related to Plaintiff's April 23, 2007, claims, Defendant contends that Plaintiff failed to exhaust her administrative remedies with respect to this claim of disability discrimination or a failure to accommodate because she only checked the box for "retaliation" on her December 2007 EEOC charge.

As discussed above, Plaintiff's claims of discrimination and failure to accommodate on May 25, 2007, must either "grow out of the investigation" prompted by the December 2007 formal charge or "the facts alleged in the charge must be sufficiently related to the claim such that those facts would prompt investigation of the claim."  *Jones*, 209 F.3d at 853.  Plaintiff's discrimination and failure to accommodate claims cannot have grown out of the investigation because Defendant's decision to not hire Plaintiff for the position is a "discrete act," which had already occurred at the time that Plaintiff filed her charge.  Second, the facts alleged in the December charge would not have prompted investigation into discrimination or a failure to accommodate, as opposed to retaliation, because Plaintiff specifically states that she believes that she is "being retaliated against for filing a previous charge," and that "I believe that Fifth Third will not rehire or reinstate me do to the filing of my previous charge," but in no way indicates that she believes that Defendant has based its actions on her alleged disability or indicates that she requested or required an accommodation.

Additionally, the fact that Plaintiff checked the box for "continuing action" does not change

-26-

the analysis.  As has already been stated numerous times, each instance in which Defendant failed

to hire or reinstate Plaintiff constitutes a "discrete act"; discrete acts occurring subsequent to

Plaintiff's May 2007 charge are required to be charged separately.  As discussed above, each

separate application does not grow out of or sufficiently relate to the May  2007 formal charge.

Moreover, the facts relevant to a claim of retaliation are significantly different from the facts

relevant to a charge of discrimination or a failure to accommodate.  For example, a claim of

discrimination or failure to accommodate requires facts to prove that the plaintiff is "disabled,"

whereas such facts are irrelevant to a claim of retaliation; and a retaliation claim requires that the

defendant have knowledge of the plaintiff's protected activity, while any protected activity is

irrelevant to a claim of discrimination or failure to accommodate.  Thus, the facts that prompt

investigation of a retaliation claim, which were alleged by Plaintiff in her December charge, do not

prompt investigation of a discrimination or failure to accommodate claim.

Accordingly, the Court will grant Defendant's motion for summary judgement based on the

Court's lack of jurisdiction due to Plaintiff's failure to exhaust her administrative remedies.  Even

if the Court had jurisdiction over Plaintiff's claims, Plaintiff was not "disabled" under the ADA, as

discussed above.

F

On June 19, 2007, Plaintiff applied for either part- or full-time teller positions at the Durand,

State Street, and Tittabawassee Road branches.  Plaintiff's December 2007 EEOC charge refers to

Plaintiff's three June 19, 2007, applications in that it refers to the fact that she has applied for six

teller positions since April 23, 2007.  Like the claims discussed above, Defendant contends that

Plaintiff failed to exhaust her administrative remedies with respect to these disability discrimination

-27-

and failure to accommodate claims because Plaintiff only checked the box for "retaliation" on her December 2007 EEOC charge.

Consistent with the analysis of Plaintiff's claims arising out of her May 25, 2007, application, the Court also lacks jurisdiction over claims related to these three applications because Plaintiff failed to exhaust administrative remedies. Likewise, even if the Court had jurisdiction, Plaintiff cannot prove that she was "disabled," as discussed above.

Additionally, with respect to Plaintiff's application for full-time teller positions at the State Street and Tittabawassee Road branches in Saginaw, it is significant that Plaintiff does not dispute that Defendant did not even know that Plaintiff had applied for the positions at the time that Defendant made its hiring decisions. Thus, Defendant cannot have discriminated against Plaintiff. With respect to the Saginaw Street position, an internal candidate was hired, thus, Plaintiff's application was never reviewed by the recruiter. With respect to the Tittabawassee Road position, Plaintiff does not dispute that the recruiter selected interviewees before Plaintiff applied for the position, the recruiter did not subsequently review the candidates, and Defendant hired one of the interviewees for the position.

G

On August 8, 2007, Plaintiff applied for a part-time teller position at the Owosso branch. Plaintiff's December 2007 EEOC charge refers to Plaintiff's application in that it refers to the fact that she has applied for six teller positions since April 23, 2007. Like the claims discussed above, Defendant contends that Plaintiff failed to exhaust her administrative remedies with respect to these disability discrimination and failure to accommodate claims because Plaintiff only checked the box for "retaliation" on her December 2007 EEOC charge.

Consistent with the analysis of Plaintiff's claims arising out of her May 25, 2007, application, the Court lacks jurisdiction over claims related to this application because Plaintiff failed to exhaust administrative remedies. Likewise, even if the Court had jurisdiction, Plaintiff cannot prove that she was disabled at the time of Defendant's decision.

IV

For the reasons stated above, Defendant is entitled to summary judgment on all of Plaintiff's ADA claims. Thus, the Court will decline to exercise jurisdiction over Plaintiff's state law claims. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966); *Washington v. Starke*, 855 F.2d 346, 351 (6th Cir. 1988) ("It is a clear rule of this circuit that if a plaintiff has not stated a federal claim, his pendant state law claims should be dismissed.").

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment [Dkt # 16] is **GRANTED**.

It is further **ORDERED** that Plaintiff's amended complaint is **DISMISSED WITH PREJUDICE**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: January 21, 2009

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on January 21, 2009.

s/Tracy A. Jacobs
TRACY A. JACOBS

---

-29-